## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ADAM KAVON; ERIN CAMDEN;
DAVID VENNER; CRAIG GELLER, on
behalf of themselves and all others
similarly situated,

      Plaintiffs,

      v.

BMW OF NORTH AMERICA, LLC,

      Defendant.

Civ. No. 20-15475 (KM) (ESK)

**OPINION**

__KEVIN MCNULTY, U.S.D.J.:__

The named plaintiffs in this putative class action, Adam Kavon, Erin Camden, David Venner, and Craig Geller, purchased or leased plug-in hybrid electric BMW vehicles that were recalled on September 30, 2020, based on a safety issue with the vehicles' batteries. Plaintiffs bring claims under the Magnuson-Moss Warranty Act (the "MMWA"), 15 U.S.C. 50 § 2301 *et seq.*, along with state law causes of action for fraud, breach of express and implied warranties, and breach of the implied covenant of good faith and fair dealing.

Now before the Court is BMW's motion (DE 47) to dismiss the Second Amended Complaint for lack of standing and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons stated herein, BMW's motion to dismiss is **GRANTED** in part and **DENIED** in part.[1]

---

[1]    Certain citations to the record are abbreviated as follows:

    DE = Docket entry in this case

    Compl. = Complaint (DE 1)

    Am. Compl. = Plaintiffs' First Amended Complaint (DE 14)

    2AC = Plaintiffs' Second Amended Complaint (DE 32)

    Mot. = BMW's Brief in Support of its Motion to Dismiss (DE 47-1)

## I.   BACKGROUND

This action is about allegedly defective batteries installed as original equipment in certain BMW hybrid models. (2AC at ¶7.) From August 20, 2020 through September 15, 2020, Plaintiffs Craig Geller, David Venner, Adam Kavon, and Erin Camden purchased or leased new 2021 BMW X5 plug-in hybrid electric vehicles ("PHEV") in Minnesota, Texas, California, and Nevada, respectively.[2] (*Id.* ¶¶ 12-15.) Those vehicles came with an express warranty, along with implied warranties arising under state law. (*Id.* ¶¶ 19, 22.)

On September 30, 2020, BMW notified the Plaintiffs, via a recall bulletin, that their vehicles and several other models (the "Class Vehicles"),[3] potentially had the following defect: "Debris may have entered one or more of the hybrid battery cells during their production" (the "Recall"). (*Id.* ¶ 27.) The Recall warned owners and lessees of the Class Vehicles that the battery defect created a risk of "a short circuit, increasing the risk of fire or injury." (*Id.* ¶ 28.) At the time the Recall was issued there was no available repair or fix for the battery, so BMW instructed owners and lessees of the Class Vehicles not to (1) charge their vehicles; (2) drive the vehicles in manual or sport mode; or (3) use the shift paddles. (*Id.* ¶¶ 16, 30.) This amounted to an instruction that owners and lessees of the Class Vehicles not use the electric functions of their PHEVs. The 2AC alleges that the Plaintiffs brought their vehicles to the "seller and/or authorized service dealers of [BMW]" to repair the defect, but that BMW "failed to and were unable to remedy the underlying problem" of the battery. (*Id.* ¶ 23.)

---

Opp. = Plaintiffs' Opposition to BMW's Motion to Dismiss (DE 50)

Reply = BMW's Reply in Support of its Motion to Dismiss (DE 53)

[2]     A PHEV can run on both electricity and gasoline. If the vehicle functions properly and the owner plugs it in regularly, most short trips can be completed without using gasoline. BMW states that the electric driving range of Plaintiffs' vehicles was 20 miles. Mot. at 2. Further, the battery can also be charged by braking, and, apparently, by using "sport mode" and the shift paddles. 2AC at ¶ 30.

[3]     These class vehicles are the 2020-2021 530e, 530e xDrive, 530e iPerformance and X3 xDrive30e and MINI Cooper Countryman All4 SE, 2020 BMW i8, and 2021 330e, 330e xDrive, 745Le xDrive, and X5 xDrive45e.

Plaintiff Kavon filed the initial complaint (DE 1) on November 2, 2020. On January 25, 2021, Kavon, Camden, and Pamela Hughes filed the Amended Complaint (DE 14).[4] The currently operative 2AC (DE 32) was filed on March 22, 2021.

Plaintiffs seeks to represent (1) a class of all those who purchased or leased the Class Vehicles nationwide (2AC at ¶ 32) and (2) pursuant to Fed. R. Civ. P. 23(c)(5), subclasses of purchasers or lessees in California, Nevada, Texas, and Minnesota. (*Id.* ¶ 34.) The 2AC asserts the following claims:

- Breach of express and implied warranty under the MMWA (Counts I and II), 15 U.S.C. 50 § 2301 *et seq.*, on behalf of the nationwide class. (*Id.* ¶¶ 48-67.)

- Breach of the implied covenant of good faith and fair dealing (Count VI) on behalf of the nationwide class, and the California, Nevada, Texas, and Minnesota subclasses. (*Id.* ¶¶ 105-114.)

- Breach of implied and express warranty under the Song-Beverly Consumer Warranty Act ("SBA") (Counts III and IV), Cal. Civ. Code § 1790, *et seq.*, on behalf of the California subclass. (*Id.* ¶¶ 68-86.)

- Fraud claims under California's Unfair Competition Law ("UCL") (Count V), Cal. Bus. & Prof. Code § 17200 *et seq.*, and Consumer Legal Remedies Act ("CLRA") (Count VIII), Cal. Civ. Code § 1750, *et seq.*, on behalf of the California Subclass. (*Id.* ¶¶ 87-104, 128-130.)

- Fraud claims under the Nevada Deceptive Trade Practices Act ("NDTPA") (Count VII), Nev. Rev. Stat. § 598.0903 *et seq.*, on behalf of the Nevada subclass. (*Id.* ¶¶ 115-127.)

- Breach of express warranty under Tex. Bus. & Com. Code § 2.313 (Count IX), and implied warranty of merchantability under Tex. Bus. & Com. Code § 2.314 (Count X), on behalf of the Texas subclass. (*Id.* ¶¶ 131-149.)

- Fraud claims under the Texas Deceptive Trade Practices Act ("TDTPA") (Count XI), Tex. Bus. & Com. Code § 17.41 *et seq.*, on behalf of the Texas subclass. (*Id.* ¶¶ 150-162.)

- Fraud claims under the Minnesota Prevention of Consumer Fraud Act ("MPCFA") (Count XII), Minn. Stat. § 325F.68 *et seq.*, on behalf of the Minnesota subclass. (*Id.* ¶¶ 150-162.)

---

[4]     Hughes brought claims under Virginia law against BMW. Hughes has since been terminated from the currently operative 2AC.

- Breach of express warranty under Minn. Stat. Ann. § 336.2-313 (Count XIII), and implied warranty of merchantability under Minn. Stat. Ann. § 336.2-314 (Count XIV), on behalf of the Minnesota subclass. (*Id.* ¶¶ 174-195.)

On March 26, 2021, BMW moved to consolidate this action with a related case. (DE 33.) Magistrate Judge Edward S. Kiel consolidated the cases for purposes of discovery and case management. (DE 43; DE 44.)[5]

On 2021, BMW filed this motion to dismiss the 2AC in its entirety. (DE 47.) Plaintiffs filed a brief in opposition (DE 50) and BMW filed a reply (DE 53). This motion is fully briefed and ripe for decision.

## II.   STANDARDS OF REVIEW

### A. Standing

Under Rule 12(b)(1), a defendant may move to dismiss on grounds that the court lacks subject matter jurisdiction over the dispute. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion is the proper vehicle for a motion to dismiss for lack of standing. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). A Rule 12(b)(1) attack can be facial where the defendant "attacks the complaint on its face without contesting its alleged facts." *See Hartig Drug Co. v. Senju Pharms. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). In such a case, the court considers only the allegations of the complaint and documents properly referred to therein, construed in the light most favorable to the plaintiff. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

### B. Failure to State a Claim

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible

---

[5]     That related case is *Burbank v. BMW NA*, Civ. No. 21-01711 (D.N.J.). Because the issues and arguments on this motion to dismiss overlap and sometimes duplicate those asserted in *Burbank,* this opinion draws substantially on an opinion I filed in that case, and reaches a similar result. (*See* 21cv1711 DE 79 (opinion filed March 21, 2022).)

on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

## III.   DISCUSSION

### A. Standing

To establish standing, a plaintiff must allege that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016). "The plaintiff as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.*

Here, BMW does not assert that Plaintiffs lack standing to bring a claim based on their purchase or lease of their own X5 vehicles, or even that Plaintiffs lack standing to bring claims on behalf of other purchasers of the same X5 model. Instead, BMW contends that Plaintiffs lack standing to bring claims on behalf of those who purchased *different* BMW PHEV model vehicles. (Mot. at 8-10.) BMW argues that courts in this District have routinely found that "Plaintiffs have no standing to pursue claims on behalf of vehicles they never leased, purchased, or used." (Mot. at 2; *see also* Mot. at 9 (citing *David v. Volkswagen Grp. of Am., Inc.*, No. CV 17-11301-SDW-CLW, 2018 WL 1960447, at *3 (D.N.J. Apr. 26, 2018)).) For example, the named plaintiff in *David* purchased a 2014 Volkswagen Touareg with an allegedly defective sunroof. District Judge Susan D. Wigenton held, however, that David did not establish standing as to "[c]laims relating to *other* Volkswagen models or model year," and would only consider allegations as to the 2014 Volkswagen Touareg. *David*, 2018 WL 1960447, at *3.

Plaintiffs respond that they have standing to bring claims on behalf of those who purchased different models, "so long as the products and alleged misrepresentations are substantially similar." (Opp. at 11 (citing *Romero v. HP, Inc.*, No. 16-CV-05415-LHK, 2017 WL 386237, at *7 (N.D. Cal. Jan. 27, 2017).) Plaintiffs cite decisions in this District that have taken a more permissive approach to standing in class action cases. In those decisions, the court analyzed a named plaintiff's standing to bring claims on behalf of purchasers of different models based on a three-part test developed by the Third Circuit in *Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1088-89 (3d Cir. 1975) (herein, the "*Haas* test"). (Opp. at 12-13; *see, e.g., Cannon v. Ashburn Corp.,* No. CV 16-1452 (RMB/AMD), 2016 WL 7130913, at *4 (D.N.J. Dec. 7, 2016); *Burke v. Weight Watchers Int'l, Inc.*, 983 F. Supp. 2d 478, 482 (D.N.J. 2013); *Stewart v. Smart Balance*, Inc., No. 11-6174, 2012 WL 4168584, at *16 (D.N.J. June 26, 2012).

Under the *Haas* test, a plaintiff may have standing "to assert claims on behalf of putative class members regarding products they did not personally purchase where (1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants." *Cannon*, 2016 WL 7130913, at *4 (citing *Stewart* and *Haas*). The *Haas* test is sufficient to satisfy the minimum threshold requirement of standing and comports with the overall goals of representative litigation. Accordingly, the Court analyzes Plaintiffs' standing to bring claims on behalf of those who purchased different models under the *Haas* test. I conclude that the Plaintiffs have standing, and that issues as to the appropriateness of Plaintiffs' representation of the purchasers of different BMW hybrid models can be addressed at the class certification stage.

All three *Haas* factors point in Plaintiffs' favor. First, the claims share an identical factual basis. Every Class Vehicle was recalled by BMW based on a potentially dangerous defect in its battery. As these vehicles were all designed and manufactured by BMW, it is plausible that the battery issues across the

various models share the same cause. This belief is only reinforced by the simultaneous recall of the different models. The 2AC, as currently alleged, concerns one type of allegedly defective battery that was used in different models of cars. Second, the products are closely related, as the vehicles are all PHEVs which contain such a battery. Third, BMW is the only defendant in this case.

Therefore, the Court finds that Plaintiffs have standing to bring claims on behalf of purchasers of all the Class Vehicles. At the class certification stage, however, Plaintiffs will have the burden of proving that the case is appropriately brought as a class action.

### B. MMWA Claims

The MMWA is a federal statute that creates a federal cause of action for breach of warranty claims *via* incorporation of state law. *DeFrank v. Samsung Elecs. Am., Inc.*, Civ. No. 19-21401, 2020 WL 6269277, at *17 (D.N.J. Oct. 26, 2020) (citing 15 U.S.C, § 2310(d)(1)). Under the MMWA, a consumer may bring a claim "(A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States, subject to paragraph (3)." § 2310(d)(1)). Paragraph 3 states that "[n]o claim shall be cognizable" if, among other things, "the action is brought as a class action, and the number of named plaintiffs is less than one hundred." § 2310(d)(3)(c).

BMW argues that Plaintiffs' MMWA claims must be dismissed on their face because the 'number of named plaintiffs" in the 2AC is "less than one hundred." (*Id.*; Mot. at 10-12.) Plaintiffs, on the other hand, assert a counterargument by negative implication from the Class Action Fairness Act ("CAFA"). CAFA, they say, contains express exceptions which evince "Congress's intent to exempt certain federal statutory claims," and no others, from the reach of CAFA. (Opp. at 17.) Those exceptions, Plaintiffs claim, are exclusive, and Congress's choice "not to exclude MMWA claims from CAFA cannot be deemed inadvertent." (Opp. at 17-18 (citing *Chavis v. Fid. Warranty Servs., Inc.*, 415 F. Supp. 2d 620, 626 (D.S.C. 2006)).)

The U.S. Court of Appeals for the Third Circuit has not directly resolved the question of whether a court may exercise jurisdiction over an MMWA claim where, as here, the complaint does not name 100 plaintiffs but the court would otherwise have jurisdiction to hear the case under CAFA. *See Opheim v. Aktiengesellschaft*, No. CV2002483KMESK, 2021 WL 2621689, at *12 (D.N.J. June 25, 2021). In the absence of appellate guidance, courts in this District routinely used to hold that CAFA could provide "a way around the MMWA's 100-named-plaintiff requirement." *Id.* (citing cases). That changed, however, after the Ninth Circuit became the first Court of Appeals to hold that CAFA does not provide an alternative basis for jurisdiction in a MMWA class action with fewer than 100 named plaintiffs. *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1035 (9th Cir. 2020); *see also Opheim*, 2021 WL 2621689, at *12. Subsequently, every court in this District to address *Floyd* has followed its reasoning. *See Opheim*, No. CV2002483KMESK, 2021 WL 2621689, at *12*; In re Subaru Battery Drain Prod. Liab. Litig.*, No. 1:20-CV-03095-JHR-JS, 2021 WL 1207791, at *19 (D.N.J. Mar. 31, 2021); *Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 885 (D.N.J. 2020).

In *Opheim*, I addressed the question of whether CAFA, enacted after the MMWA, impliedly repealed or modified the MMWA's requirements (as Plaintiffs argue). 2021 WL 2621689, at *13. I first noted two general guiding principles: that "implied repeals are generally disfavored," and that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court … strive[s] 'to give effect to both.'" *Id.* (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018); *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020)). Attempting to harmonize the two statutes, I held that the "CAFA does not modify the MMWA's requirements because CAFA applies to suits brought under diversity jurisdiction, which MMWA suits are not." *Id.*

MMWA, I reasoned, creates a federal-law cause of action (albeit by incorporation); thus, federal courts hearing MMWA claims exercise their federal-question jurisdiction. *Id.* (citing *Mims v. Arrow Fin. Servs., LLC*, 565

U.S. 368, 377, 380 (2012). By contrast, CAFA only "modifies jurisdictional requirements in diversity-jurisdiction cases so that more class actions *based only on state law* can be brought in federal court." *Id.* (citing *Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 165 (2014) (emphasis added); *see also* S. Rep. No. 109-14, at 10 (2005). Absent any indication that Congress sought to modify class-action requirements for federal claims, I found that CAFA does not apply to an MMWA claim. *Id.*[6]

I adhere to my reasoning in *Opheim*. Because the 2AC names fewer than 100 plaintiffs, and therefore does not satisfy the MMWA's procedural prerequisites, the Court must dismiss the MMWA claims (Counts I and II).

### C. State Law Warranty Claims

Plaintiffs bring state law claims for breach of express and implied warranties under California's SBA (Counts III and IV), Texas state law (Counts IX and X), and Minnesota state law (XIII).[7] For the reasons stated below, the Court grants the motion to dismiss the express warranty claims but denies the motion to dismiss the implied warranty claims.

### 1. Preemption

First, BMW asserts that the state law warranty claims fail because these claims are conflict-preempted by the federal Motor Vehicle Safety Act ("the "Safety Act"). 49 U.S.C. § 30101, *et seq.*[8]  BMW does not cite applicable precedent, but rather argues from first principles. Courts may find conflict

---

[6]   Contributing to the difficulty of the issue, however, is the peculiar nature of an MMWA claim, which incorporates state warranty law in aid of a federal law claim. Still, MMWA is a federal claim, and that status suggests a justiciable standard for harmonizing CAFA and MMWA.

[7]   As to Minnesota law, Plaintiffs only bring an express warranty claim. Additionally, Plaintiffs do not bring any warranty claims on behalf of Nevada Plaintiff Erin Camden or the Nevada sub-class.

[8]   The other two types of preemption, express and field preemption, are not invoked by BMW. Courts have held that the Safety Act does not wholly occupy the field of motor vehicle safety. *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1276 (C.D. Cal. 2016) (quoting *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2000)).

preemption if "[a] it is impossible for a private party to comply with both state and federal law and [b] where under the circumstances of a particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (cleaned up). However, there must be "clear evidence" of such a conflict. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000).

BMW identifies what it believes to be an irreconcilable conflict between the Safety Act and the state warranty laws. Under the Safety Act, car manufacturers are required "to issue a recall notice to alert consumers of a potential defect in their *cars even when parts are not available yet* for the recall"; on the other hand, the state warranty laws invoked by the Plaintiffs impose "potential liability where an automaker is unable to repair a defect in a car presented to the dealer and as a result, the vehicle is out for 30 days." (Mot. at 12.)[9] Thus, BMW argues, if it learns of a defect that it cannot immediately repair, the Safety Act requires it to alert consumers, therefore starting the clock on the state-warranty laws and essentially handing the Plaintiffs a cause of action under those laws. (Mot. at 12-13.) According to BMW, this is a "Hobson's Choice" and a classic case of conflict preemption.[10] (Mot. at 13.) Because it would be impossible for BMW to comply with both federal and state law, BMW contends, adoption of Plaintiffs' theory "would transform BMW NA's compliance with federal law into a violation of state law." (Mot. at 18.)

---

[9]    BMW does not identify or otherwise cite any Texas or Minnesota statute providing for a 30-day repair requirement, like the SBA, for a manufacturer to repair a defect in a product in breach of an express warranty. Therefore, the Court, where applicable, will assess BMW's preemption argument as to the SBA's 30-day repair requirement.

[10]    As noted in my earlier opinion, for analytical clarity, the expression "Hobson's choice" should be understood to refer not to an unappetizing choice, but to an illusory choice—"this or none." In lore, Hobson was a Cambridge stable owner who hired out horses, but required the customer to "choose" the one nearest the door. https://www.bartleby.com/81/8342.html (citing E. Cobham Brewer (1810–1897), Dictionary of Phrase and Fable (1898)).

The Court finds that BMW's preemption argument fails because it is not impossible for BMW to comply with both the Safety Act and the state warranty laws, such as the SBA. In fact, both alternatives are feasible, if not ideal from BMW's point of view. The Safety Act does not necessitate a recall notice only when a fix is immediately available; instead, it promotes the goal of safety by requiring a recall *irrespective of* whether a fix is ready. The Safety Act is concerned with safety—getting unsafe vehicles off the road—not with ensuring that consumers receive the benefit of the bargain. *See Buzzard v. Roadrunner Trucking, Inc.*, 966 F.2d 777, 783 (3d Cir. 1992) (holding that the primary goal of the Safety Act was safety, not uniformity of motor vehicle regulations); *see also Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 963 (N.D. Cal. 2004) (same). If BMW had a fix for the defective vehicles when it learned of the battery defect, BMW could then repair the class vehicles during the 30-day period permitted under the SBA. Where a prompt repair is not possible, however, the manufacturer may still comply with the SBA by revealing the defect and taking certain steps to keep dangerous vehicles off the road. Thus, it was not "impossible" for BMW to comply with both the Safety Act and the SBA.

BMW's "impossibility" argument is also undermined by exceptions to the SBA's 30-day repair requirement. The SBA states that "[d]elay caused by conditions beyond the control of the manufacturer or its representatives shall serve to extend this 30-day requirement." Cal Civ. Code § 1793.2(b)). In such a situation, the SBA provides that "conforming goods shall be tendered as soon as possible following termination of the condition giving rise to the delay." Cal Civ. Code § 1793.2(b). BMW therefore has a fact-based defense: it can avoid liability under the SBA by establishing that the delay in repairing Plaintiffs' vehicles was attributable to conditions beyond its control. For this reason, too, it was not impossible for BMW to comply with both the Safety Act and the SBA.[11]

---

[11]   Plaintiffs also cite miscellaneous case law holding that the Safety Act did not preempt California state law. While none of these cases are on all fours with this one,

As noted above, however, conflict preemption is not confined to cases of literal impossibility. Preemption may also arise when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372-73. The Safety Act's primary purpose is to increase the safety of motor vehicles. Uniformity of regulation is "at best a secondary goal." *Chamberlain*, 314 F. Supp. 2d at 963. The Safety Act also states explicitly that it does not affect warranty obligations under state statutory or common law. 49 U.S.C. § 30103(d)-(e); *see also Shields v. Bridgestone/Firestone, Inc.*, 232 F. Supp. 2d 715, 720 (E.D. Tex. 2002) ("By its express terms, the Safety Act does not state law obligations and remedies.") Indeed, the statute "contemplates that it will operate in conjunction with traditional common law tort remedies." *In re Gen. Motors LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 45 (S.D.N.Y. 2015). Accordingly, the Court finds that the state warranty laws cited in the 2AC do not pose an obstacle to the Safety Act's objectives.

Because the Court has found that it is possible for BMW to comply with both the Safety Act and state-warranty laws invoked in the 2AC, and because said laws are not an obstacle to the Safety Act's purpose, I find that the state-warranty claims are not preempted.

### 2. SBA Claims

The SBA provides that car manufacturers must repurchase cars that cannot be conformed to their express warranties after a reasonable number of attempts, as well as providing that all consumer goods must conform to the implied warranty of merchantability. Cal Civ. Code § 1991 *et seq.* For the reasons expressed below, the Court grants BMW's motion to dismiss as to the

---

they demonstrate a hesitancy to find that the Safety Act preempts state-law claims. Indeed, courts have found that the Safety Act does not preempt even state-issued recalls, which are much closer to the core purpose of the Safety Act than are state-law causes of actions for damages. *See Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208, 1218 (N.D. Cal. 2002); *Lassen*, 211 F. Supp. 3d at 1278.

SBA express warranty claim but denies the motion as to the SBA implied warranty claim.

### i. Express Warranty Claim

To state an SBA express warranty claim, Plaintiffs must plausibly allege that "(1) the vehicle had a nonconformity covered by the express warranty that substantially impaired the use, value or safety of the vehicle (the nonconformity element); (2) the vehicle was presented to an authorized representative of the manufacturer of the vehicle for repair (the presentation element); and (3) the manufacturer or his representative did not repair the nonconformity after a reasonable number of repair attempts (the failure to repair element)." *Oregel v. Am. Isuzu Motors, Inc.*, 90 Cal. App. 4th 1094, 1101 (Cal. Ct. App. 2001). BMW does not dispute the second and third elements, but disputes the first, arguing that none of the named Plaintiffs' vehicles "had a nonconformity" in fact. (Mot. at 19.)

The SBA defines an actionable "nonconformity" as a "nonconformity which substantially impairs the use, value, or safety" of the new vehicle to the buyer. Cal. Civ. Code § 1793.22(e). Perhaps because of the circularity of using the word "nonconformity" to define "nonconformity," courts have sometimes substituted the word "defect" when interpreting that statutory language.[12] *McGee v. Mercedes-Benz USA, LLC*, No. 19CV513-MMA (WVG), 2020 WL 1530921, at *4 (S.D. Cal. Mar. 30, 2020) ("A 'nonconformity' under the Act is a defect that substantially impairs the use, value, or safety of a vehicle to the buyer."); *see also Schreidel v. Am. Honda Motor Co.*, 34 Cal. App. 4th 1242, 1243 (Cal. Ct. App. 1995) ("[T]he term 'nonconformity,' as used in the [SBA], has a similar meaning to what the average person would understand to be a 'defect.'") The parties do not appear to dispute that if the nonconformity in Plaintiffs' vehicles had manifested itself, *e.g.,* through a battery short circuit,

---

[12]    Indeed, the statutory passage can perhaps be better viewed, not as defining "nonconformity," but rather as setting a threshold—*i.e.*, stating how serious the defect must be to be actionable.

that would constitute proof that the battery had a nonconformity. (Mot. at 20.) Here, however, the 2AC alleges that when the Plaintiffs and other potential class members "complained about the defective and dangerous battery system, Defendant refused to remedy the system, informed Plaintiffs there was no recall or fix available for the issue, and informed them that they should under no circumstance, charge the battery or use the vehicle in 'sport' mode." (2AC at ¶ 20.)

BMW asserts that Plaintiffs' claim must be dismissed because they do not plausibly allege that their batteries were in fact (as opposed to potentially) defective. (Mot. at 19.) BMW contends that the Plaintiffs seek to hold BMW liable for issuing a general recall, regardless of whether any particular vehicle was actually defective. In support of this argument, BMW cites cases for the proposition that a potential defect that does not actually manifest itself in a plaintiff's vehicle fails to satisfy the SBA's nonconformity element. *McGee*, 2020 WL 1530921, at *4 (finding that plaintiff had not stated an SBA claim for a defective airbag because 1) the recall notice was not an admission by the manufacturer of a defect, 2) that the recall notice indicated only that certain vehicles were affected by the defect and that plaintiff's vehicle was potentially affected, 3) that the potential defect never manifested and there was no evidence that the airbag was in fact defective, and 4) the vehicle had no other defects.); *Adams v. FCA US LLC*, No. CV164317JFWMRWX, 2016 WL 9136170, at *5 (C.D. Cal. Dec. 27, 2016) ("[B]ecause Plaintiff experienced *no* defects in her Jeep, only potential defects that were the subject of the recall notices (and repaired before any defect manifested), Plaintiff cannot satisfy the nonconformity element.") In short, BMW is saying that an overinclusive, safety-based recall cannot substitute for proof that a particular vehicle was defective in fact.

Plaintiffs respond that BMW is here raising an "issue of fact" inappropriate for resolution at the pleading stage. (Opp. at 22.) For current purposes, Plaintiffs claim, they have met their burden to allege a violation of the SBA. (*Id.*)

The SBA makes actionable "a nonconformity which substantially impairs the use, value, or safety" of the new vehicle to the buyer. Cal. Civ. Code § 1793.22(e).[13] While BMW's motion relies heavily on the "manifestation" of the defect—here, a fire or at least the overheating of the battery—the SBA does not use that word. The SBA instead refers to a nonconformity "which substantially impairs" the vehicle's value, suggesting that the nonconformity must actually exist as something more than a potentiality. Case law aligns with this reading, suggesting that the nonconformity, whether or not immediately apparent, must actually be present in the product. *See Orgel*, 90 Cal. App. 4th at 1101 (stating that a plaintiff is required to prove "the vehicle *had* a nonconformity") (emphasis added). Moreover, this is a warranty-based claim, generally remedied by replace-or-repair, which implies that an actual defect is required.

Applying these principles to the 2AC, the Court finds that the Plaintiffs have not stated an express warranty claim under the SBA because they have not alleged that *their* vehicles were in fact defective. Although the 2AC alleges that the Plaintiffs "brought the vehicle to [the] seller and/or authorized service dealers of manufacturer" to repair the defective battery, the complaint is bereft of facts suggesting that their batteries were actually defective. Plaintiffs cannot state a claim under the SBA solely because (1) a recall was issued, (2) there is a possible defect, or (3) some vehicles of the same model have a defect; instead, Plaintiffs must allege that the defect was present in *their* vehicles.

It goes too far to say that the SBA requires that the defect "manifested" in the vehicle (in this case, presumably, that the battery short circuited, resulting in the PHEVs catching fire). Manifestation is not a statutory element under the SBA, but just one reliable way of demonstrating that a nonconformity exists. *See McGee*, 2020 WL 1530921, at *4 (finding that plaintiff had not stated an SBA claim for a defective airbag, in part because there was no evidence that the

---

[13]     As previously stated, *supra*, the primary purpose of this provision appears to be to establish a threshold, *i.e.*, a level of severity beyond which a defect may be actionable.

airbag was in fact defective). There are certainly instances short of the vehicle catching fire that can suggest a nonconformity; for example, a mechanic's inspection may reveal that the battery is in fact defective. For purposes of this motion, however, the 2AC's failure to plead facts suggesting that Plaintiffs' vehicles were actually defective is fatal to their SBA express warranty claim.

### ii.    Implied Warranty Claim

Under the SBA, "every sale of consumer goods that are sold in [California] … shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1222 (9th Cir. 2015) (quoting Cal. Civ. Code § 1792). An implied warranty of merchantability guarantees that consumer goods: (1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately contained, packaged, and labeled; and (4) conform to the promises or affirmations of fact made on the container or label. Cal. Civ. Code § 1791.1(a). Unlike an express warranty, which is contractual in nature, "the implied warranty of merchantability arises by operation of law" and "provides for a minimum level of quality." *Am. Suzuki Motor Corp. v. Sup. Ct.*, 37 Cal. App. 4th 1291, 1295-96 (Cal. Ct. App. 1995).

BMW asserts that Plaintiffs cannot state a claim for breach of implied warranty under the SBA because their vehicles were fit for their intended purpose, *i.e.*, they were capable of being driven, if only on gasoline power. (Mot. at 20.) However, California courts have rejected "the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability." *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 946 (C.D. Cal. 2012) (quoting *Isip v. Mercedes–Benz USA, LLC*, 155 Cal. App. 4th 19, 27 (2007)). For instance, "[a] vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose." *Id.*

16

By analogy, the Court finds that a PHEV which cannot be driven by battery power is not fit for its intended purpose. Here, battery-powered propulsion is arguably the very feature which induces a consumer to purchase the PHEV in the first place. A consumer purchases a PHEV at a premium based on the expectation that the vehicle will run, most of the time, on electricity rather than gasoline. Indeed, it is hard to imagine a scenario in which a consumer would purchase a PHEV that would not operate on electricity, or which, if run on electricity, could overheat or catch fine. After BMW issued the Recall, Plaintiffs' vehicle essentially ceased to be the hybrid vehicle it was represented to be. The recall rendered the vehicles, at least until repaired, unfit for their intended use.[14]

---

[14]   BMW also argues that Plaintiffs' implied warranty claim under the SBA fails because the issuance of a recall alone identifying a *potential* defect, "without any manifestation of the 'defect' or a substantial likelihood that the Subject Vehicles contain the defect or will exhibit the defect does not render the cars unmerchantable." Mot. at 27. While the Court agrees that the issuance of a recall alone is not enough to establish a breach of implied warranty, there is also case law interpreting the SBA that suggests that if the plaintiff alleges that their "use of the vehicle was restricted or otherwise affected by the existence of the safety recall," this may establish that the vehicle was unfit for ordinary purposes. *Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1248, *as modified on denial of reh'g* (Feb. 22, 2018). Here, BMW's recall notice—warning owners not to charge the battery and to drive using only the gasoline engine—undermined the very basis of the consumer's bargain and rendered the PHEV unfit for its intended use.

   It is true, that *McGee* (which relies on *Gutierrez*, among other cases) stated that the existence of the recall "without any related *malfunction* [was] insufficient to raise a genuine dispute of material fact that the vehicle was unfit for its intended use." *McGee*, 2020 WL 1530921, at *6. The Court, however, finds *McGee* distinguishable from the instant action. First, in *McGee*, the Court also determined that the plaintiff failed to provide "any other evidence sufficient to raise a genuine dispute that the vehicle [was] unfit for its ordinary purpose." *Id.* The *McGee* court observed that the plaintiff did not claim "that they stopped using their vehicle" and only alleged that they "lost faith and confidence in the safety of the vehicle" due to the recall. By contrast, here, the Plaintiffs allege that BMW's recall notice instructed consumers not to use their vehicle on electric power, the *very feature* that they paid a premium for. Second, the recall notice in *McGee* (1) merely informed the consumer about a potential defect in the vehicle's airbag inflator, (2) warned the consumer about the potential danger of the defect (*i.e.*, "the defect in your passenger-side airbag inflator may cause the airbag

Therefore, the Court denies BMW's motion to dismiss the 2AC's implied warranty claim under the SBA.

### 3. Texas and Minnesota Claims

#### i. Express Warranty Claim

BMW also asks the Court to dismiss Plaintiffs' express warranty claims under Texas and Minnesota law because the 2AC does not plausibly allege that their batteries were actually defective. (Mot. 18 n. 4 ("While the case law and analysis in support of [BMW's] argument is in the context of Song Beverly Act Claim, BMW NA respectfully submits that the same reasoning should equally apply to all the warranty claims.")[15] The Court agrees and dismisses the 2AC's remaining express warranty claims.[16]

---

to explode," and (3) conveyed that the manufacturer would inform the consumer once a replacement part was available. *Id.* at *1. The BMW Recall, on the other hand, goes the extra step of asking consumers (for their safety), until a remedy is available, to use their PHEV vehicle in a manner wholly inconsistent with the basis of the purchase.

[15]    As to Plaintiffs' Minnesota express warranty claim, BMW also argues that the claim must be dismissed because the 2AC does not allege (1) privity between Plaintiffs and BMW NA, or (2) that Plaintiffs suffered property damage. Mot. at 25 n.7 (citing *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 48792, at *132 (N.D. Ill. Mar. 31, 2017) (quoting *Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, 565 N.W.2d 16, 21 (Minn. 1997).) However, as the Minnesota Supreme Court noted in *Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, third parties "who purchase, use, or otherwise acquire warranted goods have standing to sue for purely economic losses" under Minnesota law. 565 N.W.2d 16, 21 (citing Minn. Stat. Ann. § 336.2-318); *see also Gruenwald v. Toro Co.*, No. CV 19-2294 (PAM/BRT), 2019 WL 6524894, at *2 (D. Minn. Dec. 4, 2019) ("Under Minnesota law, … and express or implied warranty 'extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty.")

    Even assuming that there is no privity between Plaintiffs and BMW NA, Plaintiff Geller and the Minnesota subclass clearly fall under this provision by virtue of purchasing or leasing PHEVs manufactured by BMW NA. Indeed, the Minnesota Supreme Court clarified that only plaintiffs *lacking* "such connection to the warranted goods must demonstrate physical injury or property damage before economic losses recoverable." *Id.*

[16]    Plaintiffs' state law claims are based upon state statutes that wholly or substantially incorporate the Uniform Commercial Code ("U.C.C.") Section 2-313. The

Federal courts interpreting Minnesota law have found that is "not enough for a plaintiff to allege that a product defect suffered by others render his or her use of that same product unsafe; the plaintiff must allege an *actual manifestation* of the defect *that results in some injury* in order to state a cognizable claim for breach of warranty." *O'Neil v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008), *aff'd*, 574 F.3d 501 (8th Cir. 2009) (citations omitted); *see also Cannon Techs., Inc. v. Sensus Metering Sys., Inc.*, 734 F. Supp. 2d 753, 763 (D. Minn. 2010) ("As this Court has noted previously, a claim alleging breach of an express warranty of future performance cannot accrue until a defect actually manifests itself."); *Edin v. BSH Home Appliances Corp.*, No. 820CV00576SVWADS, 2021 WL 890702, at *3 (C.D. Cal. Jan. 19, 2021). Because the 2AC fails to plead facts suggesting that Plaintiffs' PHEVs

---

Court will therefore address BMW's arguments as to Plaintiffs' Texas and Minnesota express warranty claims together.

U.C.C. Section 2-313, with respect to "Express Warranties by Affirmation, Promise, Description, Sample," provides:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

manifested the battery defect, Plaintiffs cannot "state a cognizable claim" under Minnesota law. *O'Neil*, 553 F. Supp. 2d at 1115.

Under Texas law, whether a defect must "manifest" for a plaintiff to bring an express warranty claim is context-dependent. The Texas Supreme Court has observed that Texas "law is not well developed on the degree to which [a] defect must actually manifest itself before [a claim] is actionable." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008). Nevertheless, federal courts interpreting Texas law generally have held that a plaintiff cannot sue for breach of warranty "so long as the product had not manifested the alleged defect, especially if [for] … a consumer product with a limited useable life."[17]

A key factor therefore in determining whether to allow Plaintiffs' express warranty claim is the "usable life" of the allegedly defective PHEVs. Here, the PHEVs in question are automobiles, which courts have stated are products with "a distinctly limited usable life." *Microsoft Corp. v. Manning,* 914 S.W.2d 602, 609 (Tex. App. 1995); *see also Rosa*, 177 F. Supp. 3d at 1051; *Type III Door Latch*, 2001 WL 103434, at *4. Given the breadth of case law "indicating that Texas law does not permit plaintiffs to recover unless they have experienced some injury to a product with a limited usable life," the Court similarly finds that Plaintiffs' express warranty claims fail under Texas law.

---

[17]     *Gordon v. Sig Sauer, Inc.*, No. 4:19-CV-585, 2020 WL 4783186, at *9 (S.D. Tex. Apr. 20, 2020); *Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1025, 1053 (S.D. Tex. 2016) ("Given the extensive body of case law indicating that Texas law does not permit plaintiffs to recover unless they have experienced some injury to a product with a limited usable life, the court is not persuaded by Plaintiffs' arguments.") *Angel v. Goodman Mfg. Co., L.P.*, 330 F. App'x 750, 754 (10th Cir. 2009) ("Texas law has yet to recognize a breach of express warranty claim for unmanifested defects in products with distinctly limited useful lives…. Thus, for such products, a claim for breach of express warranty requires that the defect manifest itself.") (citations omitted); *In re Gen. Motors Type III Door Latch Litig.*, No. 98 C 5836, 2001 WL 103434, at *3 (N.D. Ill. Jan. 31, 2001) ("Court interpreting Texas law have generally opposed the idea that consumers should be able to recover damages for an allegedly defective product which has not yet malfunctioned or caused injury.").

Accordingly, the Court dismisses the 2AC's express warranty claims under Texas and Minnesota law (Counts IX and XIII).

### ii.   Implied Warranty Claim

Finally, BMW asserts that the 2AC's implied warranty claims under Texas and Minnesota law must fail because (1) Plaintiffs' PHEVs were not actually defective and (2) the Plaintiffs could still drive the PHEVs with the gas-powered engine. (Mot. at 18 n.4, 20-22, 25-27). For the reasons discussed above in relation to the SBA, the Court denies BMW's motion to dismiss the parallel implied warranty claims under Texas and Minnesota law.

Both Texas and Minnesota have adopted the provision of the UCC pertaining to the implied warranty of merchantability, which requires that goods "pass without objection in the trade under the contract description"; "are of fair average quality within the description"; "are for the ordinary purposes for which such goods are used"; and "conform to the promises or affirmations of fact made on the container or label." *See* Tex. Bus. & Com. Code § 2.314(b); Minn. Stat. Ann. § 336.2-314. For a product to be unfit for ordinary purposes, "it must have a defect, i.e., the product lacks something necessary for adequacy." *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App. 2003); *see also Carey v. Chaparral Boats, Inc.,* 514 F. Supp. 2d 1152, 1156 (D. Minn. 2007) (stating that the implied warranty of merchantability "is breached when the product is defective to a normal buyer making ordinary use of the product") (citing *Peterson v. Bendix Home Sys., Inc.,* 318 N.W.2d 50, 52–53 (Minn. 1982)); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 854 (Tex. App. 2005).

The 2AC alleges that (1) "The Class Vehicles were warranted to pass without objection in the trade under the contract description, and were required to conform to the descriptions of the vehicle contained in the contracts and labels" (2AC at ¶73); and (2) the Class Vehicles "were not in merchantable condition and are not fit for the ordinary purpose for which they are used." (*Id.* ¶¶ 146-47, 193-94.) Plaintiffs' theory of breach, at least in part, is that the

PHEVs were not merchantable because BMW (pursuant to the Recall) instructed owners and lessees of the Class Vehicles not to charge the battery, "use it in Sport mode, or use shift paddles" (Opp. at 27)—*i.e.*, the Recall effectively downgraded their PHEVs to ordinary gasoline vehicles.

It is true that courts interpreting Texas and Minnesota law have often dismissed "no-injury" implied warranty claims in which a plaintiff has not alleged that (1) the defendant sold the plaintiff a defective product or (2) plaintiff was injured by the defective product. Courts have explained that in such cases, the plaintiff still received the "benefit-of-the-bargain" by receiving a non-defective product; therefore, the plaintiff has not suffered an injury for purposes of stating an implied warranty claim premised on products liability.[18]

 This is not such a case, however. Insofar as Plaintiffs' implied warranty claim is premised upon the Recall requirements rendering the PHEV, at least until repaired, unfit for its intended use, Plaintiffs have successfully stated a claim. The intended purpose of the PHEV is to operate on battery power. Plaintiffs cannot be said to have received their "benefit-of-the bargain" when faced with the choice of either (1) obeying the Recall instructions and using their PHEV on gasoline power, despite paying a premium for a hybrid vehicle, or (2) ignoring the Recall, and therefore risking the battery short circuiting or catching fire. Such a theory is sufficiently contractual in nature and distinct from Plaintiffs' product liability allegations to survive dismissal.[19]

---

[18]    *See, e.g.*, *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 504 (8th Cir. 2009) ("[B]ecause the O'Neils' crib has not exhibited the alleged defect, they have necessarily received the benefit of their bargain…. The O'Neils' crib performs just as it was intended, and thus there is no injury and no basis for relief."); *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 320 (5th Cir. 2002) ("The Plaintiffs claim that Wyeth violated the implied warranty of merchantability by selling a defective drug, but then aver that the drug was not defective as to them…. Such wrongs cannot constitute an injury in fact."); *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999) ("Courts have been particularly vigilant in requiring allegations of injury or damages in product liability cases…. In this case, the Plaintiffs have not alleged that their [ ] brakes malfunctioned or failed.")

[19]    *See McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 552 (5th Cir. 2003) (stating that the implied warranty of merchantability is a contractual "cause of action

### D. Consumer-Protection Claims

Plaintiffs also bring statutory consumer-protection claims under California (UCL and CLRA, Counts V and VIII), Nevada (NDPTA, Count VII), Texas (TDTPA, Count XI), and Minnesota law (MPCFA, Count XII). According to Plaintiffs, if BMW had revealed that using the battery system would risk the PHEVs catching fire, neither the Plaintiffs nor the absent class members would have purchased their vehicles. BMW responds that the 2AC's allegations do not satisfy Federal Rule of Civil Procedure 9(b)'s heightened fraud pleading standards and should therefore be dismissed.

Rule 9(b) dictates that a plaintiff pleading fraud must "state with particularity the circumstances constituting fraud or mistake." The Third Circuit has interpreted this standard as requiring a plaintiff to plead "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff suffered an ascertainable loss as a result of the misrepresentation." *Alban v. BMW of N. Am., LLC*, No. CIV 09-5398 DRD, 2010 WL 3636253, at *9 (D.N.J. Sept. 8, 2010) (quoting *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)). However, the Third Circuit has also cautioned that "[c]ourts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Christidis v. Pennsylvania Mortgage Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983)).

---

… [and] whether or not any member of the class actually suffered any *physical* injury is immaterial.") (emphasis in original); *Coghlan*, 240 F.3d at 455 n.4 ("Here, the damages sought by the Coghlans are not rooted in the alleged defect of the product as such, but in the fact they did not receive the benefit of their bargain."); *cf. O'Neil*, 574 F.3d 501 at 504 ("This case is similar to other no-injury cases, in that the O'Neils have attempted to refashion what is at its core a no-injury products liability suit into a suit based in contract…. But this case does not lend itself to contractual claims because [defendants] have not failed to deliver what was promised.").

Although fraudulent concealment must typically be pled with particularity under Rule 9(b), *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984), where the facts evincing fraud "are peculiarly within the defendant's knowledge or control," courts will relax the application of this rule. *Craftmatic*, 890 F.2d at 645. But even under this more permissive Rule 9(b) application, "pleaders must [still] allege that the necessary information lies within [the defendant's] control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Id.*

Claims under the consumer-protection statutes cited in the 2AC fall within the scope of Rule 9(b). *See Llort v. BMW of N. Am., LLC*, No. 1:20-CV-94-LY, 2020 WL 2928472, at *6 (W.D. Tex. June 2, 2020), *report and recommendation adopted*, No. 1:20-CV-94-LY, 2020 WL 10054589 (W.D. Tex. June 19, 2020) ("[F]ederal courts have held that claims under the TDTPA must … satisfy Rule 9(b)'s particularity requirement."); *Switch, Ltd. v. Uptime Inst., LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019) ("To survive a motion to dismiss, the elements of an NTDPA claim[ ] must be pled with particularity pursuant to FRCP 9(b)") (citing *Horner v. Mortgage Elec. Registration Sys.*, 711 Fed App'x 817, 818 (9th Cir. 2017); *Bhatia v. 3M Co.*, 323 F. Supp. 3d 1082, 1093 (D. Minn. 2018) (applying Rule 9(b) to claim under MPCFA); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (finding that UCL claims sounded in fraud and thus the 9(b) pleading standard applied).

In moving to dismiss, BMW asserts that the 2AC neither (1) pleads facts suggesting that BMW knew of the defect when the Plaintiffs purchased or leased the PHEVs; nor (2) alleges that the Plaintiffs relied on the misrepresentations or omissions. Because the 2AC plausibly alleges both BMW's knowledge of the defect at the time of sale and Plaintiffs' reliance on BMW's alleged misrepresentations and omissions, the Court will deny BMW's motion to dismiss as to the consumer-protection claims.

24

### 1. Knowledge

Each consumer-protection statute cited by the Plaintiffs requires that the Defendant knew of the defect at the time of sale.[20] Generally, "plaintiffs who successfully allege that a manufacturer was aware of a defect at the time of sale point to specific time periods when defendants received the information." *Afzal v. BMW of N. Am., LLC*, No. CV 15-8009, 2016 WL 6126913, at *9 (D.N.J. Oct. 17, 2016); *see also See Gray v. BMW of North Am. LLC*, 22 F. Supp. 3d 373, 383 (D.N.J. 2014) (knowledge in 2009 sufficiently pled where complaint alleged "early consumer complaints about the defect" and cited technical service bulletins about the defect dating from 2005).

The 2AC first alleges that BMW "knew of the battery system defect through internal sources, testing, and consumer complaints, including when Class Members brought the Class Vehicle to [BMW] for inspection." (2AC at ¶ 20.) The 2AC does not provide specific facts as to the means by which BMW allegedly become aware of the battery defect. It is also true, of course, that BMW would have exclusive possession of evidence such as internal testing data and sources. Other indications, however, might consist of (1) consumer complaints and their dates, or (2) other records such as dealership repair records, warranty claims, or vehicle service requests. *Compare Afzal*, 2016 WL 6126913, at *9 (finding that plaintiff failed to sufficiently plead knowledge the complaint did not "identify any specific dates by or on which BMW became

---

[20]    *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012) (finding that a plaintiff must demonstrate defendant's knowledge at time of sale under CLRA); *Buraimoh v. BMW of N. Am., LLC*, No. 1:20-CV-0019-RP, 2020 WL 7711823, at *4 (W.D. Tex. Dec. 29, 2020) (stating that under the TDPTA, a plaintiff must allege a failure to disclose information "which was *known at the time of the transaction*") (emphasis added), *report and recommendation adopted*, No. 1:20-CV-19-RP, 2021 WL 2189176 (W.D. Tex. Jan. 26, 2021); *Morris v. BMW of N. Am., LLC*, No. CIV.A. 13-4980 JLL, 2014 WL 793550, at *8 (D.N.J. Feb. 26, 2014) (dismissing NDTPA claim because plaintiff alleged "no facts in support of the theory that anyone acting on behalf of BMW possessed knowledge of the alleged defects."); *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 655 (E.D. Mich. 2021) (requiring plaintiff to allege pre-sale knowledge giving rise to a duty to disclose under MPCFA).

aware of the [defect]" through various sources of information) *with Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, No. 2:17-CV-07386, 2018 WL 6804506, at *8 (D.N.J. Oct. 30, 2018) ("Here, Plaintiffs put forward the following pieces of evidence: consumer complaints; aggregate date collected from dealers; BMW warranty and field inspection personnel; testing data compiled by BMW; and chain component redesigns.") (citations omitted). These, too, are for the most part absent from the 2AC.

The 2AC also cites the recall itself. Plaintiffs purchased or leased their vehicles on August 20, 2020 (Geller), August 22, 2020 (Venner), and September 15, 2020 (Kavon and Camden); BMW issued the Recall only thereafter, on September 30, 2020. (2AC at ¶12-16; 30.) Plaintiffs claim that BMW in its own Recall bulletin acknowledged "that the Class Vehicles were defective." (2AC at ¶ 157.) The question becomes whether that knowledge may plausibly be cast backward in time to the dates that Plaintiffs bought their vehicles. Based on the facts as alleged in the 2AC, and BMW's virtual monopoly on the relevant facts, the Court finds that Plaintiffs have alleged enough to unlock the doors of discovery.

Temporal proximity between the point of sale and the recall may suggest an inference of knowledge, even where the recall follows the sale.[21] This temporal proximity, although hardly ironclad, plausibly suggests BMW's knowledge of the battery defect. The Plaintiffs' purchases occurred in August and September 2020. It is improbable that BMW first became aware of the battery problems on September 30, 2020, and *that same day* took the drastic action of issuing the Recall.[22] The decision to recall the Class Vehicles likely

---

[21]    That inference is stronger with respect to the transactions that occurred in September 2020 (Kavon and Camden), as opposed to those made in August 2020 (Venner and Geller.)

[22]    Indeed, BMW previously issued a recall as to three Class Vehicles (*i.e.*, X3 xDrive30e Sports Activity Vehicle ("SAV"), X5 xDrive45e SAV, and 330e Sedan), though not the specific X5 vehicles purchased or leased by Plaintiffs, on August 14, 2020. *Burbank v. BMW of N. Am., LLC*, No. CV2101711KMESK, 2022 WL 833608, at *5 (D.N.J. Mar. 21, 2022). Therefore, this recall and the September 30, 2020 recall

reflected BMW's "accumulation of knowledge" over time concerning issues with the PHEVs' batteries, whether from consumer complaints or from internal sources, such as testing and data.

BMW is in exclusive control of most of the information that would establish when it *first* became aware of the alleged defect, and the surrounding circumstances as alleged in the 2AC are sufficiently suggestive. Accordingly, the Court will deny the motion to dismiss as to the issue of BMW's knowledge.

### 2. Reliance

BMW also claims that Plaintiffs' consumer protection claims fail because the 2AC does not allege, as required, that Plaintiffs relied on BMW's misrepresentations or omissions. (Mot. at 31-33.) The reliance element requires that Plaintiffs plausibly allege that "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (citing *Mirkin v. Wasserman*, 23 Cal. Rptr. 2d 101 (Cal. 1993)).[23]

It is true, as BMW asserts, that Plaintiffs do not allege that they "researched" or "saw any BMW NA materials regarding the [Class Vehicles]" before purchasing their vehicles. (Mot. at 32-33) (citing *Daniel*, 806 F.3d at 1225). However, as previously stated, battery-powered propulsion is arguably the very feature which induces a consumer to purchase the PHEV at a

---

(covering all Class Vehicles), considered together, only strengthens the inference that BMW knew of battery problems as early as August 2020.

[23]     *See also Gordon v. Sig Sauer, Inc.*, No. CV H-19-585, 2019 WL 4572799, at *21 (S.D. Tex. Sept. 20, 2019) (stating that the TDTPA "requires a plaintiff to prove detrimental reliance on the alleged false or misleading representation."); *Bank of New York Mellon v. Sunrise Ridge Master Homeowners Ass'n*, No. 217CV00233JADDJA, 2020 WL 2064065, at *6 (D. Nev. Apr. 28, 2020) (granting summary judgment to defendant because plaintiff bank did not establish that it "acted in reliance on such representations," as required under the NDTPA); *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1268 (W.D. Wash. 2009) ("Plaintiffs' failure to allege reliance on Defendants' omissions or misrepresentations appears fatal under Minnesota law.")

premium. It logically follows that BMW's disclosure of the defect would have changed the Plaintiffs' behavior.[24]

The 2AC plausibly alleges that the battery issue was material and that Plaintiffs would not have purchased their PHEVs if they had known of the battery defect. (*See* 2AC at ¶ 102.) Accordingly, because the Court finds that Plaintiffs have sufficiently alleged reliance, I decline BMW's motion to dismiss as to the fraud-based consumer-protection claims (Counts V, VII, VIII, XI, and XII).

### E. Implied Covenant of Good Faith and Fair Dealing

Finally, Plaintiffs allege that BMW violated the covenant of good faith and fair dealing implied in their warranties. The 2AC alleges that "[e]very contract in California contains an implied covenant of good faith and fair dealing," and that BMW breached this covenant "by, inter alia, failing to notify Plaintiffs and Class Members of the Battery Defects in the Class Vehicles, and failing to fully properly repair this defect."[25]

---

[24]   *See Mize v. BMW of N. Am., LLC*, No. 2:19-CV-007-Z-BR, 2020 WL 1526909, at *9 (N.D. Tex. Mar. 31, 2020) ("The Court finds that Plaintiffs have plausibly pleaded that BMW … failed to disclose the N63 engine defect, that it was material information about the vehicle known by BMW prior to each of Plaintiff's sales, and BMW withheld the information of the defect as it intended to induce Plaintiffs to purchase the vehicles."); *Richey v. Axon Enterprises, Inc.*, 437 F. Supp. 3d 835, 848 (D. Nev. 2020) (finding that plaintiff adequately alleged defendant's (1) knowledge of "material facts" and (2) inducement of plaintiff based, in part, on allegations that defendant's engineers "were aware of the alleged defect, … [and] did not inform consumers of the defect"); *Daniel*, 806 F.3d at 1225 ("That one would have behaved differently can be presumed, or at least inferred, when the omission is material."); *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 696-97 (Minn. 2014).

[25]   While Plaintiffs' implied covenant claim is asserted on behalf of the "Nationwide Class and The California, Nevada, Texas, and Minnesota Subclasses," the 2AC curiously only includes allegations concerning *California law* and does state whether the claim is also being brought under Nevada, Texas, and/or Minnesota law.  *See* 2AC at ¶ 107; Mot. at 34 n.9 ("[T]he SAC does not contain any allegations relating to the other three States at issue in this lawsuit for this claim.") Although BMW raised this issue in their motion, Plaintiffs do not clarify whether the 2AC's asserts this claim under only California law or all four states.

California law provides that "[e]very contract imposes on each party a duty of good faith and fair dealing in each performance and its enforcement." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (Cal. App. 2012) (internal quotation marks omitted). To state a claim that the covenant was breached, Plaintiffs are required to allege that "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 473 (N.D. Cal. 2014).

Courts interpreting California law have stated that a breach of the implied covenant "requires something more than a breach of the contractual duty itself." *Lyons v. Coxcom, Inc.*, 718 F. Supp. 2d 1232, 1239 (S.D. Cal. 2009) (citing *Careau & Co v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 (Cal. Ct. App. 2009)). That is, the breach of the implied covenant "implies unfair dealing rather than mistaken judgment." *Id.* Moreover, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (Cal. 1992). Therefore, an action for breach of the implied covenant "cannot be extended to create obligations not contemplated by the contract." *J & J Sports Prods., Inc. v. Sally & Henry's Doghouse, LLC*, No. 13-CV-2924 W JMA, 2015 WL 4714975, at *9 (S.D. Cal. Aug. 7, 2015) (citing *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (Cal. Ct. App. 2004)).

 While Plaintiffs allege generally that BMW breached the warranty, the 2AC does not provide facts suggesting that BMW "unfairly interfered with [Plaintiffs'] rights to receive the benefits of the contract." Compensation for an

---

Accordingly, the Court will analyze this claim under California law. If Plaintiffs wish to amend their complaint to add causes of action under Nevada, Texas, and Minnesota law, they may do so on a motion to amend.

unmanifested defect, for example, is not properly a benefit of the express warranty at all; as noted above, the express warranty claim fails not because BMW took some bad-faith action to circumvent it, but only because these particular plaintiffs have failed to allege that their vehicles had a nonconformity. The implied warranty claims, by contrast, survive, and if breached, may support relief. But Plaintiffs' "labels and conclusions" do not appear to be distinguishable from Plaintiffs' claims of actual breach, and do not support an implied-covenant claim.

Therefore, the Court finds that the implied-covenant claim is not plausibly alleged and must be dismissed. *Twombly*, 550 U.S. at 555.

## IV.   CONCLUSION

For the reasons set forth above, BMW's motion to dismiss is **GRANTED** in part and **DENIED** in part. The MMWA and state express warranty claims are dismissed in their entirety (Counts I (MMWA), IV (SBA), IX (Texas), XIII (Minnesota)). The MMWA implied warranty (Count II) and implied covenant of good faith and fair dealing (Count VI) claims are also dismissed in their entirety. The motion to dismiss will be denied as to the state implied warranty claims and state consumer protection claims.

A separate order will issue.

Dated: June 3, 2022

/s/ Kevin McNulty
_____
**Hon. Kevin McNulty**
**United States District Judge**